# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
JEFFREY DRURY,                                    :
                                                  :
                    Petitioner,                   :        Case No. 3:13-cv-3135 (BRM)
                                                  :
          v.                                      :
                                                  :
STATE OF NEW JERSEY, et al.,                      :        **OPINION**
                                                  :
                    Respondents.                  :
_____          :

**MARTINOTTI, DISTRICT JUDGE**

Petitioner, Jeffrey Drury, is a state prisoner proceeding *pro se* with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was first convicted in 2003 by a jury of sexual assault, terroristic threats, carjacking, theft by unlawful taking, and kidnapping. He is currently serving an aggregate prison term of twenty-five years with an eighteen-and-one-half years period of parole ineligibility. Petitioner raises several claims in his habeas petition.  For the reasons set forth below, the Petition is denied and a certificate of appealability shall not issue.

## I.    FACTUAL BACKGROUND

This Court, affording the state court's factual determinations the appropriate deference, *see* 28 U.S.C. § 2254(e)(1),[1] will recount salient portions of the recitation of facts as set forth by the New Jersey Supreme Court:

> On September 16, 2000, Jane Jones, [FN1] Alexis Armour, Bob Brown, and Mary Morgan were at the home of a friend in Bordentown. All four were high-school students and each of them was sixteen or seventeen years old. Shortly before midnight, they decided to go to Trenton to buy marijuana. Bob drove the others in

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

his father's car, a four-door sedan. Jane sat in the front passenger seat, with Mary seated behind her, while Alexis sat in the rear seat directly behind the driver. When they arrived in Trenton, they drove along a street where they believed they would be able to make their purchase. They saw a man, later identified as defendant, sitting or lying down and holding a brown bag. As the car began to drive by, they heard defendant say "weed, weed." Bob slowed the car to a stop. As he did, defendant approached, opened the back passenger side door where Mary was seated, and got into the car next to her without asking permission.

> [FN1 The Appellate Division identified the four people, other than defendant, who were involved in the events that led to defendant's conviction by use of fictitious names, which designations we have elected to continue, with the exception of our election to alter the first name of one of the teenagers from Alex to Alexis to correctly convey the fact that she, like Jane and Mary, was female.]

Defendant, who had a large, partially consumed bottle of beer in the bag, asked the teenagers how much marijuana they wanted to buy. When they told defendant that they wanted ten dollars worth, he offered to give them fifteen dollars worth instead if they would give him a ride to where he wanted to go. The teenagers agreed, and defendant directed Bob to a house. According to Jane, defendant got out of the car and went into the house, but soon returned, telling the teenagers he could not make the purchase at that location and needed to be taken elsewhere. Defendant provided directions, and when they arrived at the second location, defendant said he wanted one of the girls to go with him into the building to make the purchase. He first asked Mary, the back-seat passenger, if she would go with him, but she declined, telling him she felt ill. Jane, the front-seat passenger, agreed to go instead.

Jane testified that she and defendant went into a nearby building and that defendant knocked on the door of an upstairs apartment. Two people answered the door and, after first leaving Jane alone in a bedroom, defendant went with them to a back room. When defendant returned, he told Jane that the others were getting the marijuana. He then locked the bedroom door and asked Jane about the nature of her relationship with Bob. She told him that she and Bob were involved romantically but that she was a virgin.

According to Jane, defendant then told her, in a "strong . . . demanding" voice, that he was going to engage in sex with her. She

2

refused and tried to unlock the door to leave, at which point defendant grabbed her from behind. Jane then began to scream and cry as defendant threatened to slit her throat with a knife and choked her into unconsciousness. When she revived, defendant was undressing. As she resisted his efforts to undress her, defendant again began to choke her and threatened to hit her. Jane continued to resist, but eventually defendant pried her legs apart and penetrated her vaginally.

After defendant completed his assault on Jane, he led her downstairs and out to the car where the other three teenagers were waiting. Instead of getting into the back seat, defendant opened the driver's door and told Bob to move over. Bob refused, saying that he was driving. Defendant ordered Bob to move over and then shoved him out of the driver's seat and into the front passenger seat.

As a result, Jane, who had already opened the front passenger door to get back into that seat, instead took the rear passenger-side seat where defendant had been sitting earlier. Jane testified that she was crying when she got into the car and that she told the two other girls in the back seat what had happened. The other teenagers testified that Jane was crying, had bruises on her neck, and that there was a cut on her eyebrow that was bleeding. Mary, who was then sitting next to Jane, testified that Jane told her that defendant had threatened to slit her throat and had raped her. Alexis testified that Jane whispered to her that defendant had raped her. Alexis also noticed that Jane's "pants were undone and her shoes weren't tied."

Although at least three of the four teenagers had cell phones at some point during the night, defendant confiscated Bob's when it rang, and the teenagers were afraid to use theirs to call for help either during the twenty or thirty minutes when Jane and defendant were gone or after she returned. They testified that they did not call for help because they were afraid of defendant and afraid that they would be punished because they had been involved in an attempt to buy illegal drugs.

After defendant and Jane had returned to the vehicle, defendant drove the car, with the four teenagers in it, around Trenton for approximately forty-five minutes, [FN2] making one or two stops for the purpose of purchasing drugs for himself through the open window of the car and, according to Bob and Alexis, having Bob purchase "blunts" for him. According to the teenagers, only defendant ingested any drugs at any time during the night. When some of the teenagers asked defendant for permission to get out of the car, he refused. In addition, although at one point during the

drive defendant apologized to Jane for "what happened back there," he also ordered her to "shut up" because she would not stop crying.

> [FN 2 Jane estimated that defendant continued driving them around Trenton for "at least a half-hour, forty-five minutes." The estimates given by the other teenagers varied from a minimum of a half-hour to as much as two and one-half hours in duration.]

Eventually, defendant drove back to the first house where they had stopped and got out of the car, taking the keys with him and saying he would return. The four teenagers waited until he had disappeared from sight and then got out and ran from the car to seek help. Jane had trouble keeping up with the others because her shoes were untied and her pants were still unbuttoned. Alexis was able to flag down a car driven by two gentlemen who drove the four teenagers to a guardhouse near a bridge, where the police were summoned. Photographs taken of Jane that night at the hospital showed marks and bruises on her neck, and a DNA analysis identified defendant's semen on Jane's panties.

Defendant offered a different version of the night's events. In relevant part, he testified that he called out to the slowly passing car to indicate that he had drugs for sale and then got into it after being given permission to do so. He directed Bob to keep driving so the transaction would not be discovered and sold or gave crack cocaine to Bob four times during the events that followed, starting with a ten dollar sale shortly after he got into the car. According to defendant, right after the initial sale, he asked the teenagers to take him to replenish his supply in exchange for free crack which they readily agreed to do. He testified that he began to converse with Jane soon after and that they stopped at a gas station where he bought cigars.

Defendant testified that when he went into the first house, his supplier did not have enough of the drugs he wanted to purchase and told him to return later that night. He explained that he then told Bob to drive around while he looked for other suppliers. Defendant stated that as they were driving, he and Jane continued to converse and that Jane willingly agreed to have sex with him in exchange for fifty dollars, of which twenty-five dollars would be paid in advance, with the balance to be paid when they had finished. He then directed Bob to the second house and showed him a safe location where Bob and the others could wait while he and Jane had sex. Defendant also recalled that he gave Bob more crack to make him "comfortable" while he was waiting. After the car was parked, defendant asked "the girl in the back seat" if she wanted to join him, but she declined.

4

Defendant testified that he and Jane got out of the car, that he gave Jane twenty-five dollars as soon as they were out of sight of the others, and that they then went into the building where he paid ten dollars for use of a room. According to defendant, he became annoyed when Jane asked him if he had a condom and was unwilling to let him penetrate her, offering to perform oral sex instead. He claimed they did not have sexual intercourse. Because he was not satisfied with what transpired, defendant demanded that Jane return the money he had paid her. Defendant testified that he put his arm around her neck and choked her when she refused to give him his money back. He denied that she lost consciousness, but conceded that he choked her, commenting that he was then able to grab the money back from her.

According to defendant, he took over the driving after he and Jane returned to the car only because he knew how to get back to the house where his supplier was. He took the keys with him when he parked because he thought that otherwise the teenagers would drive away and leave him there, making it difficult for him to get back to the location where he had first met them. Defendant testified that when he returned and found that they were not waiting for him in the car, he drove around looking for them because he did not want the situation "to escalate ... bigger than what it ... really was." He eventually abandoned the car when he was unable to find them.

[. . .]

Prior to trial, the State sought leave to return to the grand jury in an effort to amend the indictment as it pertained to first-degree sexual assault. That count of the original indictment was based on the assertion that defendant had committed the act of penetration "during the commission or attempted commission of carjacking." Recognizing that carjacking is not enumerated as an offense that raises sexual assault from a second-degree to a first-degree crime, *see N.J.S.A.* 2C:14–2a(3), the prosecutor sought an opportunity to reindict defendant for having committed the sexual offense during the commission of a kidnapping, which is listed as a permissible predicate offense.

The court denied the motion, reasoning on the record that an amendment would not be necessary. The court pointed out that robbery is one of the enumerated offenses that will suffice to elevate the sexual offense to a first-degree crime and concluded that carjacking was "an upgrade[d] [form] of robbery" which could therefore support the first-degree conviction. When charging the

5

> jury, the court utilized a portion of the Model Charge, *see Model Jury Charges (Criminal),* § 2C:14–2a(3) Aggravated Sexual Assault (June 19, 2001), for aggravated sexual assault and instructed the jury that carjacking constituted an appropriate predicate offense. The jury verdict sheet also used carjacking in place of one of the specifically enumerated offenses.

*State v. Drury*, 919 A.2d 813, 815–18 (N.J. 2007).

Following trial, the jury found Petitioner guilty of first-degree aggravated sexual assault, N.J. Stat. Ann. § 2C:14-2a; third-degree aggravated assault, N.J. Stat. Ann. § 2C: 12-1b(7); third-degree terroristic threats, N.J. Stat. Ann. § 2C: 12-3; four counts of first-degree carjacking, N.J. Stat. Ann. § 2C:15-2; third-degree theft by unlawful taking, N.J. Stat. Ann. § 2C:20-3a; and four counts of first-degree kidnapping, N.J. Stat. Ann. § 2C:13-1b. *See id.* at 818. Petitioner was subsequently sentenced to an aggregate term of forty-five years in prison, subject to twenty-seven years of parole ineligibility.  *See Drury*, 919 A.2d at 819.

## II.   PROCEDURAL HISTORY

On January 5, 2004, following his conviction, Petitioner appealed to the New Jersey Superior Court, Appellate Division. On January 27, 2006, the Appellate Division issued its opinion and held that while carjacking was sufficient to elevate the sexual assault charge to a first-degree offense, that the record did not support the finding that Petitioner had been attempting or in the commission of the carjacking when he sexually assaulted Jane Jones. *See State v. Drury,* 889 A.2d 1087, 1095 (N.J. Super. Ct. App. Div. 2006). The Appellate Division also held that based upon the jury verdict, the jury had found all of the elements necessary to sustain the lesser-included offense of second-degree sexual assault. *See id.* As a result, the Appellate Division modified Petitioner's conviction from a first-degree sexual assault to a second-degree sexual assault, affirmed the remainder of Petitioner's convictions, and remanded the matter for resentencing. Petitioner appealed to the New Jersey Supreme Court, and on April 4, 2006, his petition for certification was

granted. *See State v. Drury*, 897 A.2d 1058 (N.J. 2006). However, the Supreme Court limited the appeal to the following two issues: whether carjacking was an offense that could support a first-degree sexual assault conviction, and whether recent New Jersey case law in *State v. Natale*, 878 A.2d 724 (N.J. 2005), affected Petitioner's sentence on his kidnapping conviction. *See State v. Drury,* 919 A.2d 813, 815 (N.J. 2007). On April 24, 2007, the New Jersey Supreme Court "reverse[d] the conclusion of the Appellate Division that defendant's commission of carjacking could support his conviction of first-degree aggravated sexual assault," but affirmed the judgment of the Appellate Division "modifying his conviction on that count to a conviction of second-degree sexual assault." *Id.* at 825. The Supreme Court also held that Petitioner was entitled to a sentencing remand on his kidnapping conviction, pursuant to *Natale*. *See id.* But, "[i]n all other respects, defendant's conviction [was] affirmed." *Id.* at 826.

Petitioner was resentenced on December 12, 2008 to an aggregate sentence of twenty-five years in prison with a period of eighteen-and-one-half years parole ineligibility. *See State v. Drury,* Indictment No. 01-07-0898, 2012 WL 1205862, at *1 (N.J. Super. Ct. App. Div. Apr. 12, 2012).

On July 23, 2007, Petitioner submitted a verified petition for Post-Conviction Relief ("PCR"). (*See* ECF No. 37-19.) On November 13, 2009, a hearing on the petition was held before the Honorable Mitchel E. Ostrer, J.S.C. (*See* ECF No. 37-23.) Following oral argument, Judge Ostrer denied the petition from the bench. (*See id.* at 12; *see also* ECF No. 37-24 at 1.) Petitioner subsequently appealed the denial of his PCR to the Appellate Division. (*See* ECF No. 37-25 at 1.) On April 12, 2012, the Appellate Division issued an opinion affirming the PCR court's decision and denying Petitioner's appeal. (*See* ECF No. 37-29.) Petitioner subsequently filed a petition for certification to the New Jersey Supreme Court that was denied on July 20, 2015.  (*See* ECF No. 37-31 at 1.)

In May 2013, Petitioner filed the instant habeas action.  Respondent filed an answer in opposition, and Petitioner filed a traverse thereafter.

### III.   LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Meyers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Therefore, "a federal court may not issue a writ simply because the court concludes in its independent

judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "[Federal courts] may not characterize [] state-court factual determinations as unreasonable 'merely because [they] would have reached a different conclusion in the first instance.' . . . If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (alterations in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Dennis v. Sec'y Dep't of Corr.*, 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated

the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

### IV.   DECISION

#### A.   Fifth Amendment Rights

In Petitioner's Ground One, he argues that his Fifth Amendment rights were violated when, during a post-arrest interview, he invoked his right to remain silent, but the prosecutor later questioned him at trial regarding that post-arrest silence. Petitioner first raised this claim on direct appeal. On appeal, the Appellate Division held, and the New Jersey Supreme Court summarily affirmed, that the prosecutor had not, in fact, questioned Petitioner about his post-arrest silence at all and that Petitioner's argument was without merit. *See State v. Drury*, 889 A.2d 1087, 1097 (N.J. Super. Ct. App. Div. 2006), *aff'd in part*, *rev'd in part*, 919 A.2d 813, 826 (N.J. 2007).

After Petitioner was arrested on September 28, 2000, he was interviewed by Detective Sheila Tatarek. (*See* ECF No. 37-2 at 85.) During the interview, Petitioner invoked his right to remain silent. (*See id.*) On September 29, 2000, Petitioner was again brought to the criminal investigation bureau and advised of his rights. (*See* ECF No. 37-2 at 86.) Detective Tatarek asked Petitioner if he wanted to waive his right to an attorney and speak to Detective Tatarek about the investigation. (*See id.*) Petitioner responded that "he didn't take anything from anybody" and "the girls wanted it." (*See id.*) Detective Tatarek again asked Petitioner whether he wanted to waive his right to an attorney and speak about the case. (*See id.*) Petitioner again repeated that "they wanted it" and that "he didn't force anybody to have sex." (*See id.*) Petitioner decided that he did not want to speak with police and asked for an attorney. (*See* ECF No. 37-2 at 87.) Prior to trial, a *Miranda* hearing was held to determine whether Petitioner's statements were admissible at trial. *See State*

*v. Drury*, No. A-5973-09T4, 2012 WL 1205862, at *8 n.5 (N.J. Super. Ct. App. Div. Apr. 12, 2012). The trial court ruled that Petitioner had been advised of his rights and had voluntarily blurted out the statements, thereby making them admissible. *See id.* At trial, the prosecutor questioned Petitioner about the statements he had made to Detective Tatarek.

> Q: You were just going to leave her there?
>
> A: Yeah.
>
> Q: You're going to leave her there 'cause you raped her?
>
> A: I never raped anybody in my life.
>
> Q: No?
>
> A: Nope. I got daughters, I got sisters.
>
> Q: You can't rape if she wants it, right?
>
> A: If she wants it, how can I rape?
>
> Q: <u>That's what you told Detective Tatarek as soon as they picked you up</u>?
>
> A: She wanted it. I mean, she made the deal to do it but the deal didn't go through.
>
> Q: <u>Told Detective Tatarek those girls wanted it; right? Because you never raped anybody</u>?
>
> A: No, never raped anybody.

(ECF No. 37-6 at 67 (emphasis added).)

Although no objection was made at trial, Petitioner argued on appeal and again contends in the instant Petition that the prosecutor improperly questioned him regarding his post-arrest silence, intimating Petitioner must be guilty because he did not immediately deny committing the rape when he was first apprehended by police.

A prosecutor is not permitted to question a testifying defendant regarding his post-arrest silence. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).

> [W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, [. . .] it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of the arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his testimony.

*Id.* at 619 (quoting *United States v. Hale,* 422 U.S. 171, 182-83 (1975) (White, J., concurring)).

Upon review of the record, this Court cannot conclude that the prosecutor remarked upon Petitioner's post-arrest silence. The prosecutor did not mention, or even imply, that Petitioner had invoked his right to remain silent. Nor did the prosecutor's line of questions raise any inference that Petitioner must be guilty because he did not immediately deny committing the crime when he was arrested by police. The prosecutor briefly asked Petitioner about statements he had made to Detective Tatarek; statements that the court had ruled were admissible following a *Miranda* hearing. Thus, the prosecutor did not infringe on Petitioner's Fifth Amendment right because the prosecutor never questioned Petitioner about his post-arrest silence. Accordingly, the denial of this claim by the state courts was not an unreasonable application of clearly established federal law.

### B.  Sexual Assault Charge

In Ground Two, Petitioner renews his direct appeal claim that the State failed to prove beyond a reasonable doubt that he sexually assaulted Jane Jones, a violation of his Fourteenth Amendment due process rights.[2] Specifically, Petitioner states the following:

---

[2]     Petitioner does not appear to have raised this claim at each level of state appellate review and has therefore not exhausted this claim in state court as required by federal habeas law. *See* 28 U.S.C. § 2254(b)(1)(A). On direct appeal, Petitioner did argue that the State had not proven the first-degree sexual assault charge beyond a reasonable doubt. (*See* ECF No. 37-12 at 2.) However, after the New Jersey Supreme Court ruled on his case in 2007, Petitioner never raised the argument that the second-degree sexual assault charge was not proven beyond a reasonable doubt, or that he

> I never penetrated nor had sex with the alleged victim during the commission of a carjacking nor any other time. The NJ Supreme Court agreed that I didn't commit a sexual assault during the commission of a carjacking and molded that first degree aggravated sexual assault charge into a second degree sexual assault conviction and charge. This offense was not proven beyond a reasonable doubt. The entire sexual assault charge and conviction should have been vacated or I should have received a new trial. But the NJ Supreme Court made their ruling and rendered the issue moot.

(ECF No. 11 at 11.)

"[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged." *Patterson v. New York*, 432 U.S. 197, 210 (1977). A reviewing court may determine that a conviction violates Due Process if it is supported "only by evidence that no reasonable trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). Evidence is deemed sufficient to support a conviction "so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 319). Pursuant to 28 U.S.C. § 2106, federal appellate courts have concluded that their "power to modify erroneous judgments" authorizes them to reduce a defendant's conviction "to a lesser included offense where the evidence is insufficient to support an element of the [greater] offense stated in the verdict," and the Supreme Court has "noted the

---

should have been given a new trial instead of a modification of his first-degree sexual assault charge. Therefore, this claim has not been exhausted. 28 U.S.C. § 2254(b)(1)(A).

However, the exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims, and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Granberry v. Greer*, 481 U.S. 129, 135, 107 S. Ct. 1671, 95 L. Ed. 2d 119 (1987). Accordingly, notwithstanding Petitioner's failure to exhaust this claim, this Court will proceed to address the substantive merits of the claim. 28 U.S.C. § 2254(b)(2); *Lindh v. Murphy*, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997) ("[Section 2254(b)(2) authorizes] federal courts to deny unexhausted claims on the merits.").

use of such practice with approval." *Rutledge v. United States*, 517 U.S. 292, 305-06 (1996) (quoting *Austin v. United States,* 382 F.2d 129, 140, 141-43 (D.C. Cir. 1967); *see also United States v. Eiland*, 738 F.3d 338, 359 (D.C. Cir. 2013) (recognizing ability of courts of appeals to direct entry of judgment for a lesser-included offense when conviction of a greater offense cannot be sustained).

Similarly, New Jersey appellate courts have the authority "to enter a judgment of conviction for a lesser included offense where the jury verdict necessarily constitutes a finding that all of the elements of the lesser included offense have been established and where no prejudice to the defendant results." *State v. Farrad*, 753 A.2d 648, 658-59 (N.J. 2000). At the time of Petitioner's conviction and subsequent direct appeals, the law in New Jersey stated that a guilty verdict may be molded to convict a defendant of a lesser-included offense if that following criteria were met: "(1) defendant has been given his day in court, (2) all the elements of the lesser-included offense are contained in the more serious offense, and (3) defendant's guilt of the lesser-included offense is implicit in, and part of, the jury verdict." *Farrad*, 753 A.2d; *see also State v. R.P.,* 126 A.3d 1226, 1231 (N.J. 2015) (reaffirming *Farrad* test but adding additional criteria that no undue prejudice will result to the accused).

Here, the findings of the jury at Petitioner's trial were sufficient to support a finding of each element of the lesser included offense of second-degree sexual assault. The Appellate Division addressed this issue on direct appeal stating, in pertinent part:

> The question then is whether the record permits us to conclude that the jury found the elements of second-degree sexual assault under [N.J. Stat. Ann.] 2C:14-2c(1), that is, an act of penetration when defendant "use[d] physical force or coercion, but the victim [did] not sustain severe personal injury." There is no question that the evidence supports such a finding; we must be satisfied, however, that the jury actually made that finding, and we are. Second-degree sexual assault, as defined by [N.J. Stat. Ann] 2C:14-2, requires proof

14

> of sexual penetration under one of several circumstances, including the actor's use of "physical force or coercion." The jury found defendant guilty on Count 4, charging the separate crime of terroristic threats against Jones, that is, threatening "to commit any crime of violence with the purpose to terrorize . . ." *See* [N.J. Stat. Ann.] 2C:12-3. That finding meets the required element of [N.J. Stat. Ann.] 2C:14-2c(1).

*State v. Drury*, 889 A.2d 1087, 1095 (N.J. Super. Ct. App. Div. 2006) (footnote omitted).

The New Jersey Supreme Court summarily affirmed the Appellate Division's modification of the conviction to a second-degree offense.

This Court concurs with the holding of the New Jersey Supreme Court and the reasoning of the Appellate Division. The New Jersey Model Criminal Jury Charge instructs that the offense of second-degree sexual assault requires a jury find the following elements:

1. That defendant committed an act of sexual penetration with another person.
2. That defendant acted knowingly.
3. That the defendant used physical force or coercion.
4. That the victim did not sustain severe personal injury.

*New Jersey Model Jury Charges (Criminal)*, "Sexual Assault by Force or Coercion (N.J. Stat. Ann. § 2C:14-2c(1))" (rev. Jan. 24, 2005).

The first two elements of second-degree sexual assault mirror the first two elements of first-degree sexual assault. Thus, the jury's finding that Petitioner was guilty of first-degree sexual assault necessitates the conclusion that the jury also found the first two elements of second-degree sexual assault. Regarding the third element required for second-degree sexual assault, and as the Appellate Division noted, the jury found Petitioner was guilty of terroristic threats against Jane Jones. (*See* ECF No. 37-9 at 3.) To have found Petitioner guilty of terroristic threats, the jury had to find that Petitioner "threaten[ed] to commit a crime of violence against [Jane Jones]." (*See id.*) This finding by the jury that Petitioner had threatened the Jane Jones with violence also

necessitates the conclusion that the jury found the third element of second-degree sexual assault, that Petitioner had used physical force or coercion against her. Accordingly, the jury can be said to have found all of the elements necessary to convict Petitioner of the lesser-included offense of second-degree sexual assault, and his guilt was proven beyond a reasonable doubt.

The holding of the New Jersey Supreme Court to modify Petitioner's first-degree conviction to a second-degree conviction was not in violation of clearly established federal law. As discussed above, federal law permits appellate courts to reduce a defendant's conviction to a lesser included offense where the evidence is insufficient to support an element of the greater offense stated in the verdict. Having determined that a first-degree conviction of sexual assault could not be sustained, the New Jersey Supreme Court reduced Petitioner's conviction to the lesser-included offense after finding that the jury's verdict supported all of the elements of that lesser offense. Therefore, Petitioner's claim does not violate clearly established federal law and he is not entitled to relief on this claim.

### C.  Dr. Goode's Failure to Appear at Trial

#### 1.  Sixth Amendment Right to Effective Assistance of Counsel

In Ground Three, Petitioner appears to be raising an ineffective assistance of counsel claim based upon his trial counsel's failure to move for a judgment of acquittal after a subpoenaed witness refused to appear in court. Petitioner subpoenaed Dr. Goode, the doctor who performed a pelvic examination of the victim, to testify at trial. (*See* ECF No. 37-6 at 25-26.) However, Dr. Goode failed to appear. (*See id.*) The State and defense counsel agreed to provide a stipulation to the jury, in lieu of Dr. Goode's testimony, that would include the relevant information about which Dr. Goode would have testified. (*See id.* at 31.) The agreed-upon stipulation stated:

> Dr. Goode performed a pelvic examination at the emergency room
> of Robert Wood Johnson University Hospital on [Jane Jones]. The

examination revealed that there were no signs of trauma to [Jane Jones'] genital area. There were no bruises to the vagina or the vulva that were noted. [Jane Jones] was cooperative. Her last prior act of intercourse was early August. The general examination given to [Jane Jones] revealed that [Jane Jones] had bruises on her neck. This examination was performed on September 17th, 2000.

(ECF No. 37-6 at 32.)

In the instant claim, Petitioner contends that Dr. Goode's testimony would have negated any finding of sexual assault, and that because Dr. Goode did not testify, the trial court and Petitioner's trial attorney "let the jury assume things that aren't true." (ECF No. 11 at 12.) Specifically, Petitioner states he "never penetrated nor had sex with the alleged victim. I masturbated myself with the help of the alleged victim and it was all consensual." (*See id.*) Petitioner appears to be arguing that if Dr. Goode had testified, Dr. Goode's testimony would have proven that Petitioner did not sexually assault Ms. Jones. When defense counsel learned that Dr. Goode refused to appear in court, Petitioner argues that his trial counsel should have made a motion for a judgement of acquittal.[3]

---

[3]    Petitioner does not appear to have raised this claim at each level of state appellate review and has therefore not exhausted this claim in state court as required by federal habeas law. *See* 28 U.S.C. § 2254(b)(1)(A). Before the PCR court, Petitioner did raise a similar claim alleging that Dr. Goode's failure to appear in court deprived defendant of "his federal and state constitutional rights to the effective assistance of counsel, to due process, and to a fair trial." (*See* ECF No. 37-21 at 22.) On appeal from the PCR court's denial of his petitioner, however, Petitioner did not raise that claim, bringing instead only claims of ineffective assistance of PCR. Therefore, this claim has not been exhausted. 28 U.S.C. § 2254(b)(1)(A).

However, as discussed previously, the exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims, and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Granberry v. Greer*, 481 U.S. 129, 135, 107 S. Ct. 1671, 95 L. Ed. 2d 119 (1987). Accordingly, notwithstanding Petitioner's failure to exhaust this claim, this Court will proceed to address the substantive merits of the claim. 28 U.S.C. § 2254(b)(2); *Lindh v. Murphy*, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997) ("[Section 2254(b)(2) authorizes] federal courts to deny unexhausted claims on the merits.").

The Sixth Amendment guarantees the right to effective assistance of counsel. U.S. Cont. amend. VI. To prevail on a claim of ineffective assistance of counsel, a party must establish that: 1) counsel's performance was deficient; and 2) the petitioner was prejudiced by counsel's deficiency. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). The first *Strickland* prong is an objective standard which requires the petitioner to show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. In evaluating whether counsel was deficient, "the proper standard for attorney performance is that of reasonably effective assistance." *Id.* The Constitution requires a fair trial, not some higher quality of legal representation. *See id.* at 688-89. Thus, the standard is highly deferential, and counsel is "strongly presumed to have rendered adequate assistance" and to have used "reasonable professional judgment." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016). Therefore, for a petitioner to satisfy the first prong of the *Strickland* test, they must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

The second prong of the *Strickland* test requires that a petitioner demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The petitioner bears the burden of demonstrating how he was prejudiced. Thus, where a petition contains "no factual matter . . . and only provides unadorned legal conclusion[s] . . . without supporting factual allegations, that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief." *Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015) (internal quotations and citations omitted).

18

Here, Petitioner is unable to demonstrate the second *Strickland* prong. The results of Dr. Goode's report, that there were no signs of trauma to Ms. Jones' genital area, that there were no bruises to her vagina or vulva, and that Ms. Jones' last prior act of intercourse was in early August, were all presented to the jury in the agreed-upon stipulation. The jury was provided these facts, which supported Petitioner's argument that he had not sexually assaulted Ms. Jones, despite Dr. Goode not testifying. The stipulation was read first by the judge, and Dr. Goode's findings were then again emphasized during defense counsel's closing statement. Thus, the jury was not "led to assume things that aren't true" as Petitioner alleges, and Petitioner could not have been prejudiced because all of the information he wanted the jury to glean was provided to them.

Further, although Petitioner argues that his trial counsel was ineffective for failing to move for a judgment of acquittal after becoming aware that Dr. Goode would not testify, Petitioner's trial counsel did, in fact, move for such a judgment of acquittal. New Jersey Court Rule 3:18-1, which governs a motion before submission to jury provides:

> At the close of the State's case or after the evidence of all parties has been closed, the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment or accusation if the evidence is insufficient to warrant a conviction.

N.J. Ct. R. 3:18-1.

On May 28, 2003, after learning that Dr. Goode would not be available to testify, and after the close of the State's case-in-chief, trial counsel made a motion for a judgement of acquittal, arguing that the State had not presented a prima facie case for any of the alleged charges. (*See* ECF No. 37-6 at 29.) However, the trial court ruled that a reasonable jury could find Petitioner guilty of all of the charges beyond a reasonable doubt and denied trial counsel's motion. (*See id.* at 30-31.) Despite the fact that the motion was denied, the motion that Petitioner now alleges trial counsel

was ineffective for not bringing was actually raised. Thus, Petitioner cannot demonstrate that he suffered prejudice as a result of having the stipulation read to the jury in lieu of Dr. Goode's live testimony.

In addition to not being able to demonstrate prejudice, Petitioner also cannot establish that trial counsel was deficient for not compelling Dr. Goode to testify. It appears from the record that that Dr. Goode felt animosity towards Petitioner. (*See* ECF No. 37-23 at 8.) Trial counsel's choice to enter a stipulation and not to force Dr. Goode to testify was likely a prudent strategic choice. *See Strickland,* 466 U.S. at 690-91 (holding that "strategic choices made thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *see also United States v. Schake*, 57 F. App'x 523, 526 (3d Cir. 2003) (holding that counsel's failure to call a witness was reasonable because "counsel feared he would be a reluctant witness"). As the PCR court aptly reasoned when ruling upon this issue, a stipulation allowed trial counsel to elicit the favorable facts he wanted from Dr. Goode, while simultaneously avoiding the risk that Dr. Goode would add other information during his testimony that may harm Petitioner. (*See* ECF No. 37-23 at 8-9.) Thus, without being able to demonstrate that trial counsel was deficient or that Petitioner was prejudiced by trial counsel's alleged errors, Petitioner is not entitled to relief on this claim.

### 2. Sixth Amendment Compulsory Process Clause

In Ground Four, Petitioner states that, "Dr. Goode performed the rape exam and did receive a subpoena to testify from me and the State but Dr. Goode refused to report to court to testify during trial." (ECF No. 11 at 14.) This claim is similar to Petitioner's Ground Three, however, this Court construes Petitioner's claim as implicating the Compulsory Process Clause under the Sixth Amendment.

The Sixth Amendment provides a criminal defendant the right to offer the testimony of favorable witnesses and "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The right to present the testimony of witnesses and to compel their attendance, if necessary, is a fundamental element of due process. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). Although not a right expressly described in the Constitution, the Supreme Court has held that this Compulsory Process Clause is grounded in the Sixth Amendment. *See Taylor v. Illinois*, 484 U.S. 400, 409 (1988). A defendant establishes that his right to the compulsory process has been violated by demonstrating that "(1) he was deprived of the opportunity to present evidence in his favor; (2) the excluded testimony would have been material and favorable to his defense; and (3) the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purposes." *United States v. Bianchi*, 594 F. Supp. 2d 532, 545 (E.D. Pa. 2009) (citing *Mills*, 956 F.2d at 445 (citing *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Evidence is considered material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Mills*, 956 F.2d at 446 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982)). And, a "reasonable likelihood" is "a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). However, unlike other Sixth Amendment rights that arise automatically, action by a defendant is required to invoke his right to compulsory process. *Taylor*, 484 U.S. at 410. "The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct." *Id.*

In the instant case, it is undisputed that Petitioner did not invoke his compulsory process right at trial. Rather than request that the court compel the witness appear, trial counsel instead made the decision to enter a stipulation about what Dr. Goode would have testified to and to have

that stipulation read to the jury in lieu of Dr. Goode's live testimony. Moreover, Petitioner is unable to demonstrate that his compulsory process was violated. First, the trial court did not deprive Petitioner of the opportunity to present Dr. Goode's testimony. Dr. Goode was issued a subpoena by Petitioner's trial counsel and when he did not appear, the court afforded trial counsel the opportunity to reach out to Dr. Goode yet again.

> MR. SOMERS [trial counsel]: Your Honor, if we can address another matter, I subpoenaed Dr. Goode to come to trial and, your Honor, I haven't heard from Dr. Goode. My detective went over to try to speak to him and give him the subpoena and asked him to call me so that I could tell him exactly when to be here. He has not responded, your Honor.
>
> THE COURT: When did you subpoena him?
>
> MR. SOMERS: Subpoenaed him two weeks ago.
>
> THE COURT: You haven't heard anything?
>
> MR. SOMERS: No, I haven't heard anything, your Honor. He indicated to my detective that he did not want to speak to me, that he would speak at trial.
>
> THE COURT: Okay.
>
> MR. SOMERS: And, your Honor, here again I have no way of --
>
> THE COURT: What was the date on the subpoena?
>
> MR. SOMERS: It was for the week, your Honor, if I may approach.
>
> THE COURT: If you want to take this time now and call him, perhaps Miss Higgins [prosecutor] you better call too and explain to the Doctor he has been subpoenaed and he should be here today. We haven't heard anything from him?
>
> MR. SOMERS: No, your Honor, with the exception of what he told my detective. I had my detective try and reach out for him again yesterday. He was unsuccessful.
>
> THE COURT: All right. Call him now and let me know how you make out.

(ECF No. 37-6 at 25-26.)

There was no further discussion on the record regarding Dr. Goode's failure to appear until trial counsel and the prosecutor informed the trial court that they had agreed upon a stipulation. (*See id.* at 31.) When it became apparent that Dr. Goode was not going to appear in court, the trial court agreed to read to the jury the stipulation. (*See id.*) Thus, the trial court cannot be said to have deprived Petitioner of the opportunity to present evidence in his favor when the trial court both permitted trial counsel the opportunity to reach out to Dr. Goode yet again and read to the jury the stipulation about what Dr. Goode would have testified to had he appeared.

Second, Petitioner cannot establish that Dr. Goode's live testimony would have been material and favorable to the defense to such an extent that it could have affected the jury's judgment. As discussed previously, the pertinent portions of Dr. Goode's testimony that buttressed Petitioner's claim that he did not sexually assault Jane Jones were still presented to the jury through the stipulation. Indeed, the stipulation included only evidence that was favorable to Petitioner. There was no other information favorable to Petitioner's defense indicated in the record that Dr. Goode would have testified to that was not stated in the stipulation, and, significantly, Petitioner does not allege that there was any such additional information. Thus, Petitioner cannot demonstrate that Dr. Goode's live testimony regarding the same information that was contained in the stipulation that was read to the jury would have affected the jury's judgment. Accordingly, Petitioner is not entitled to relief under this claim.

## V. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner fails to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

**VI.    CONCLUSION**

For the reasons stated above, the Petition for habeas relief is **DENIED** and a certificate of appealability shall not issue.


DATED: June 16, 2020                                    */s/Brian R. Martinotti*
                                                        **BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**